UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED
AUG 19 2009
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**TRENA N. CLARK,**

      **Plaintiff,**

v.   Civil Action No. 2:09cv36

**CITY OF CHESAPEAKE,**

      **Defendant.**

## OPINION AND ORDER

Pending before the court are two motions for summary judgment. On July 9, 2009, the defendant, the City of Chesapeake ("the City") filed a motion for summary judgment arguing that the court should grant summary judgment in its favor as to the plaintiff, Trena N. Clark's, claims for employment discrimination based upon gender and sex, and dismiss for lack of jurisdiction Ms. Clark's retaliation claim. On July 27, 2009, Ms. Clark, appearing pro se, filed a motion for summary judgment on her employment discrimination and retaliation claims. The court has reviewed the parties' supporting memoranda and finds that a hearing is unnecessary for the resolution of the issues presented. For the reasons set out herein, the court **GRANTS** the defendant's motion for summary judgment, and **DENIES** the plaintiff's motion for summary judgment.

## Factual Background

**1.   Ms. Clark's Employment with the City of Chesapeake Fire Department**

Ms. Clark, an African-American female, began working for the City of Chesapeake Fire Department ("the Fire Department") in 1996 as a Firefighter/EMT, specifically a Shock Trauma/Firefighter as she is certified to provide advanced life support emergency medical

services at the "shock trauma" level. Ms. Clark's job responsibilities include responding to fires and other emergency situations, extinguishing fires, rescuing and providing emergency medical services, performing salvage operations, identifying persons requiring immediate care, providing life-saving procedures, and transporting victims for emergency care. Firefighter/EMTs utilize both the fire engine and the medic unit, or ambulance, as needed, when responding to fires and other emergency situations. The medic unit is typically staffed with two Firefighter/EMTs, one being a paramedic and one certified for "shock trauma" services. A Shock Trauma/Firefighter receives the same pay regardless of whether she is assigned to the fire engine or the medic unit for her shift.

It is routine for firefighters to be transferred to various fire stations throughout the City of Chesapeake based upon the operational needs of the Fire Department. The Fire Department attempts to accommodate individual transfer requests from firefighters whenever possible, but the Fire Department's operational needs dictate whether the transfer can be fully accommodated. Ms. Clark was first assigned to Station 10, and she was then transferred to Station 2. Ms. Clark then requested, and was granted, a transfer from Station 2 to Station 3. Ms. Clark then requested to be transferred from Station 3 to Station 13; however, the Fire Department could not fully accommodate her request and she was transferred to Station 7 instead. Ms. Clark was then transferred from Station 7 to Station 8, where she remained at the inception of her lawsuit, and it is this transfer that is the subject of her discrimination claims.

On June 1, 2006, Ms. Clark was transferred from Station 7 to Station 8 so that Lynn

Pieroni, a white, male firefighter could be transferred to Station 7.[1] Mr. Pieroni was in the "Power Company" in Station 8, which trained new recruits at the fire academy, and he was not certified as a Shock Trauma/Firefighter. Mr. Pieroni requested a transfer out of Station 8, a busier fire station, because of personal medical issues that would result in him using several of his sick leave days. Mr. Pieroni requested to go to Station 13 because it was considered the least busy fire station in Chesapeake, and his medical issues and absences would have a lesser impact on the Fire Department if he was transferred there. Mr. Pieroni's request to go to Station 13 could not be accommodated, but the Fire Department could transfer him to Station 7, which was also not as busy a fire station as Station 8. According to Battalion Chief Jennings, Ms. Clark was chosen to be transferred from Station 7 to Station 8 because Station 8 received more medic unit calls, averaging six to seven calls a day, than Station 7, which received the fewest medic calls and averaged two calls per day. Ms. Clark's transfer would also result in a ratio of Shock Trauma/Firefighters and medic units in Battalion 2 and Battalion 3 that would more accurately reflect the needs of each Battalion. Station 7 is part of Battalion 2 and Station 8 is part of Battalion 3. Prior to Ms. Clark's transfer in June 2006, there were seven Shock Trauma/Firefighters in Battalion 2 to cover two medic units, resulting in a ratio of 3.5 Shock Trauma/Firefighters per medic unit. At the same time, there were ten Shock Trauma/Firefighters in Battalion 3 to cover three medic units, resulting in a ratio of 3.33 Shock Trauma/Firefighters per medic unit. After Ms. Clark's transfer to Station 7, there was a ratio of 3 Shock Trauma/Firefighters per medic unit in Battalion 2, and 3.66 Shock Trauma/Firefighters per medic

---

[1] In addition to the transfers of Ms. Clark and Mr. Pieroni, the Fire Department transferred approximately twenty other firefighters in June 2006.

unit in Battalion 3. As a result of Ms. Clark's transfer, there were no Shock Trauma/Firefighters at Station 7 on shift "C," but because of the low number of medic calls Station 7 received, these assignments would be filled by "swing"[2] or overtime personnel.

Upon being transferred to Station 8 on June 1, 2006, Captain Ackliss became Ms. Clark's supervisor. Both Ms. Clark and Captain Ackliss were apprehensive to working with one another after the incident regarding Ms. Clark's 2000 performance evaluation. In 2000, when both Ms. Clark and Captain Ackliss were assigned to Station 2, Ms. Clark received a poor performance evaluation from Captain Ackliss, and she disagreed with Captain Ackliss's ratings of her performance in several of the categories. Captain Ackliss's initial rating of Ms. Clark's performance precluded Ms. Clark from receiving a raise to which she felt she was entitled. She appealed the performance evaluation, and as a result of her appeal, several of her ratings were increased, and Ms. Clark received her raise. According to Ms. Clark, this incident caused a rift between her and Captain Ackliss; however, upon Ms. Clark's transfer to Station 8 in 2006, Captain Ackliss apologized to Ms. Clark for the previous problems in 2000, and encouraged Ms. Clark to do the best she could do at Station 8.

In December 2006, Battalion Chief Jennings, who had authorized the transfer of Ms. Clark from Station 7 to Station 8, offered Ms. Clark the opportunity to return to Station 7, shift A.[3] Ms. Clark refused the offer to return to Station 7.

---

[2] "Swinging out" occurs when a medic not assigned to that station assists that station on a shift, but it is not a permanent transfer. For example, a firefighter assigned to Station 13 may, "swing out" and fill in a shift at Station 7 if Station 7 was short a medic for that shift.

[3] When Ms. Clark was originally at Station 7, she was in shift C. Ms. Clark argues that this offer to return to Station 7 should not be considered because she was not being returned to her original shift, but a new shift, shift A. However, Ms. Clark has failed to identify how shift A

As noted above, Ms. Clark had been the only Shock Trauma/Firefighter at Station 7, shift C, and this resulted in her being assigned to ride the medic unit more frequently than the fire engine when she was at Station 7. From June 1, 2005 to May 31, 2006, when Ms. Clark was assigned to Stations 3 and 7, she rode the fire engine 51.18% of her regular shifts, and the medic unit 47.48% of her regular shifts. In her first year at Station 8, from June 1, 2006 to May 31, 2007, Ms. Clark rode the fire engine 60.56% of her regular shifts and the medic unit 38.30% of her regular shifts. From June 1, 2007 through May 31, 2008, Ms. Clark rode the fire engine 75.76% of her regular shifts, and the medic unit 23.38% of her regular shifts. Station 8's commanders, Captain Ackliss and Captain Dosmann, tried to rotate Shock Trauma/Firefighter assignments between the medic unit and the fire engine but sometimes there were discrepancies in the assignments due to sickness, vacations, or other personnel assignments.

According to the defendant, in Ms. Clark's fourteen years with the Fire Department, there has only been one occasion in which she was told she could not trade time.[4] Battalion Chief Wooten informed the individual that Ms. Clark was seeking to trade time with that he would not approve their time trade. Battalion Chief Wooten was not Ms. Clark's Battalion Chief at this time, and Ms. Clark's own Battalion Chief has never denied her request to trade time.

With respect to the overtime, the Fire Department utilizes a computer program called

---

is in any way inferior to shift C. According to Ms. Clark's deposition testimony, each station has three shifts, A, B, and C. Each shift works for a twenty-four hour period, and these shifts rotate so that each shift ends up working 10 or 11 days a month. When one shift is working, the other two shifts are off. Therefore, it appears that the only real difference between shifts A, B, and C, are the dates these shifts are assigned to work, and the people assigned to each shift, but there is no difference in the duties, responsibilities or benefits between the three shifts.

[4] Trading time is when two firefighters switch shifts.

Telestaff for its scheduling and record-keeping needs. The Telestaff program has an automated procedure for filling open overtime shifts. The Telestaff computer places a call to a firefighter to notify him or her of the available overtime opening, and the firefighter is allowed to either reject or accept the opening. If a firefighter declines the overtime opportunity, then Telestaff will proceed down a list of other firefighters who have indicated a willingness to work overtime. Additionally, once a firefighter declines an overtime opportunity, he will not be contacted again by Telestaff to accept that particular overtime assignment. This happened to Ms. Clark in March 2007. On March 16, 2007, Ms. Clark rejected an overtime work opportunity on March 18, 2007, and as a result of her rejection, she was no longer eligible to accept the March 18, 2007 overtime shift, and that shift was assigned to a white, male Shock Trauma/firefighter.

Telestaff also enables the Fire Department to compile reports of all the hours a firefighter has worked, as well as what assignments the firefighter has worked, whether it be the medic unit or the fire engine. From 2006 to 2008, Ms. Clark voluntarily signed up for thousands of hours of overtime, the majority of which were for medic units. In 2006, Ms. Clark worked a total of 2,453.75 overtime hours, of which 1,717.74 hours were on the medic unit and 736 hours were on the fire engine, and this was the most overtime worked by any of the approximately 280 employees in the Fire Department in 2006. In 2007, Ms. Clark worked a total of 1,296 overtime hours, which included 757 hours in the medic unit and 539 hours on the fire engine, and she was ranked seventh out of 279 employees in terms of total overtime. Specifically with respect to March and April 2007, in which Ms. Clark later alleges she was unfairly denied overtime, the Telestaff report indicates that she worked 72 hours of overtime in March 2007 and 130 hours of overtime in April 2007.

2.  EEOC Charges of Discrimination

On July 27, 2006, two months after her transfer, Ms. Clark filed a Charge of Discrimination with the EEOC alleging that her transfer from Station 7 to Station 8 was because of her race and gender. On December 11, 2006, Ms. Clark amended her initial charge to include allegations that she was not permitted to work on the engine during her rotations, and that she was assigned to medic during her regular shifts and when she "swung out," and that these decisions were made based upon her race and gender. On November 1, 2008, Ms. Clark received a right-to-sue letter from the EEOC for her race and gender discrimination claims.

On October 15, 2007, Ms. Clark filed a second Charge of Discrimination with the EEOC, alleging retaliation for filing her first EEOC complaint in 2006. Specifically, Ms. Clark claimed that from March 2007 to April 2007, she signed up for, but was denied, overtime that was offered to coworkers who had not applied for overtime. Additionally in April 2007, a coworker that traded time with Ms. Clark informed Ms. Clark that their trade time would be monitored, and that in September 2007, he had to calculate his trade time back four years. Ms. Clark alleged that the denial of overtime and monitoring of trade time were retaliation for her first EEOC complaint. This is the first time Ms. Clark made allegations regarding retaliatory conduct by anyone in the Fire Department. Subsequent to filing her complaint in this court, Ms. Clark amended her October 2007 EEOC complaint on February 12, 2009 to also allege further acts of retaliation: (1) that in August 2008, her shoes were hung from the rafters in the fire station bay; (2) that on December 25, 2008, she was not allowed to ride the fire engine and was instead assigned to another district to work the medic unit; and (3) that on December 31, 2008, her bedroom linens were thrown to the floor. Ms. Clark has not yet received a right-to-sue letter

from the EEOC for her October 2007 EEOC complaint alleging retaliation.

3.   Procedural History

On January 28, 2009, Ms. Clark, filed a complaint in this court against the defendants, the City, the Fire Department and Chief R. Stephen Best, Sr., alleging three claims: (1) employment discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII") , 42 U.S.C. § 2000e-2 (Count 1); (2) employment discrimination on the basis of gender in violation of Title VII, 42 U.S.C. § 2000e-2; and (3) retaliation in violation of Title VII, 42 U.S.C. § 2000e-3.  In her complaint, Ms. Clark alleges that she was transferred from Station 7 to Station 8 to accommodate a white, male firefighter who requested a transfer, and that this action was discriminatory because there were three other white, male firefighters in Station 7 who could have been transferred to accommodate the request instead of her.  Compl. ¶¶ 13-15. Ms. Clark also alleges that upon being transferred to Station 7, she was not assigned to work on the engine, rather she was assigned to medic both when she was at her station and when she was assisting other stations.  Compl. ¶ 16.  Ms. Clark alleges that this was discriminatory because it resulted in her working more medic assignments than any other Shock Trauma/Firefighter at Station 7.  Compl. ¶¶ 16-18.  Finally, Ms. Clark also alleges that in response to her filing an EEOC complaint regarding her claims of race and gender discrimination, the defendants retaliated against her by denying her the opportunity to work overtime, and monitoring her trade time with co-workers.  Compl. ¶¶ 20-24.

On June 16, 2009, the court granted the Fire Department and Chief Best's motion to dismiss all three of Ms. Clark's claims against them, leaving just the City as a defendant in this action. The City filed its motion for summary judgment on July 9, 2009, and Ms. Clark filed her

response to that motion on July 27, 2009. The City replied on August 3, 2009, and the motion was then referred to the court for review. On July 27, 2009, Ms. Clark also filed a motion for summary judgment, which appears to be identical in both form and substance to her response to the City's motion for summary judgment. The City responded to Ms. Clark's motion on August 5, 2009, and Ms. Clark chose not to submit a reply to the City's response brief. Ms. Clark's motion was referred to the court on August 14, 2009, after the time for her to submit a reply had expired.

### Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). The court must assess the evidence and draw all permissible inferences in the non-movant's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Nevertheless, the non-movant must make a sufficient evidentiary showing on each element of their claims such that a jury could reasonably find in their favor. Celotex, 477 U.S. at 322. While it is the movant's burden to show the absence of a genuine issue of material fact, Pulliam Investment Co., Inc. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987), it is the non-moving party's burden to establish its existence. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 585-587 (1986).

The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in [their] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The evidence that the non-moving party presents to this end must be more than a "mere scintilla." Barwick v. Celotex Corp., 736 F.2d 946, 958-959 (4th Cir. 1984). In order for the non-moving party to survive summary judgment, they must present evidence that is "significantly probative." Celotex Corp., 477 U.S. at 327. If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249-250. District courts have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323-25).

When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. See Cray Communications Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th Cir. 1994). A plaintiff, however, may not create an issue of fact by submitting an affidavit that is inconsistent with their prior deposition testimony. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990).

Summary judgment does not require that no factual issues be in dispute. To find against the moving party, the court must find both that the facts in dispute are material and that the disputed issues are genuine. Only "facts that might affect the outcome of the suit under governing law" are material. Anderson, 477 U.S. at 248. A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. Thus, Rule 56 mandates summary judgment against a party "who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

## Analysis

Title VII prohibits an employer from discriminating against an employee based upon that "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Title VII prohibits an employer from taking retaliatory action against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3. Ms. Clark has alleged claims of employment discrimination based upon her race and her gender in violation of 42 U.S.C. § 2000e-2(a), and a claim of retaliation in violation of 42 U.S.C. § 2000e-3.

1.  Claims of Racial and Gender Discrimination in violation of Title VII (Counts 1 and 2)

In an employment discrimination case, the plaintiff must first establish a prima facie case of impermissible discrimination. See, e.g., Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). A prima facie case of discrimination under Title VII requires a plaintiff to show that (1) she was a member of a protected class; (2) she suffered adverse employment action; and (3) she was treated differently than similarly situated employees outside of the protected class. See id. at 253.

If the plaintiff establishes a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" Id. at 253 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Should the defendant satisfy this burden, then the plaintiff must prove by a preponderance of the evidence that the employer's articulated reasons are a pretext for discrimination. Id. at 253.

In establishing a <u>prima facie</u> case for racial and/or gender discrimination under Title VII, it is clear and undisputed that Ms. Clark, as an African-American female, is a member of two protected classes. The parties dispute whether the City's actions constituted adverse employment actions, and whether Ms. Clark was treated differently than other individuals who are not members of her protected classes. Ms. Clark asserts that the City adversely affected her employment in two ways: (1) transferring her from Station 7 to Station 8 to partially accommodate the transfer request of white, male firefighter; and (2) upon being transferred to Station 8, she was assigned to the medic unit during her shifts and when she "swung out" and was not assigned to the fire engine. With respect to her first alleged adverse employment actions, Ms. Clark asserts that she was treated differently because there were other firefighters, who were white males, that could have been transferred instead of her to accommodate Mr. Pieroni's transfer to Station 7, and there are several individuals within the Fire Department that have never been transferred who could have accommodated Mr. Pieroni's transfer. As to the second adverse employment action, Ms. Clark asserts that she was treated differently because she rode as medic more than any other Shock Trauma/Firefighter at Station 8. The City argues that neither of these two employments actions can be considered adverse employment actions, and even if they are considered adverse employment actions, Ms. Clark has failed to establish that she was treated differently than other individuals who are not members of the protected classes.

In <u>Holland v. Washington Homes, Inc.</u>, 487 F.3d 208 (4th Cir. 2007), the Fourth Circuit explained that

> [a]n adverse employment action is a discriminatory action that adversely affects the terms, conditions, or benefits of the plaintiff's employment. The mere fact that a new job assignment is less appealing to the employee, however, does not

> constitute adverse employment action. There must be some significant detrimental effect and absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.

Id. at 219 (internal citations and quotations omitted); see also James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004); Boone v. Goldin, 178 F.3d 253 (4th Cir. 1999).

The court finds that Ms. Clark's transfer to Station 7 cannot be considered an adverse employment action as it did not result in any decrease in compensation, loss of job title, or decrease in level of responsibility. She remained a Shock Trauma/Firefighter with the Fire Department, held the same job responsibilities and duties, and earned her same salary. Ms. Clark did not lose any benefits by transferring stations, nor did the terms or conditions of her employment change. Ms. Clark has not alleged, nor shown any proof, that her transfer from Station 7 to Station 8 decreased her opportunities for promotion. The only real difference between Station 7 and Station 8 is how busy the two stations are, as Station 8 is considered one of the busier stations in the Fire Department. However, there is no evidence that Ms. Clark was required or obligated to work more shifts at Station 8 than she had at Station 7. The transfer to Station 8 was also less appealing for Ms. Clark as her supervisor at Station 8 was an individual she had previously had a difficult relationship, but upon Ms. Clark's arrival to Station 8, Captain Ackliss apologized to her for their prior history and wished her well. Ms. Clark even admits in her deposition that during both times she worked for Captain Ackliss at Stations 2 and 8, he never said anything to Ms. Clark that she considered to be discriminatory of her race or gender. Therefore, while Ms. Clark may not have wanted to be transferred from Station 7 to Station 8,

there is nothing in her transfer from which the court could find that it was an adverse employment action by the City.

As to Ms. Clark's second claim that upon being transferred she was not assigned to the fire engine, only to the medic unit, the court finds that there is no evidence of this being an adverse employment action because the evidence presented actually contradicts Ms. Clark's claim. The record actually establishes that Ms. Clark was assigned to the medic unit less and she was assigned to the fire engine more during her regular shifts than she had been at Station 7. From June 1, 2005 to May 31, 2006, when Ms. Clark was assigned to Stations 3 and 7, she rode the fire engine 51.18% of her regular shifts, and the medic unit 47.48% of her regular shifts.[5] In her first year at Station 8, from June 1, 2006 to May 31, 2007, Ms. Clark rode the fire engine 60.56% of her regular shifts and the medic unit 38.30% of her regular shifts. From June 1, 2007 through May 31, 2008, Ms. Clark rode the fire engine 75.76% of her regular shifts, and the medic unit 23.38% of her regular shifts. While Ms. Clark's overtime hours may have resulted in her being assigned to the medic unit more than the fire engine, the City's evidence shows that the majority of the overtime that Ms. Clark agreed to was for the medic unit. The voluntary overtime in the medic unit that Ms. Clark signed up for would skew her hours so that overall she was working more hours in the medic unit; however, it is her regular shifts in which her supervisors determine her assignment, and the evidence indicates that upon being transferred from Station 7 to Station 8, Ms. Clark actually was assigned the medic unit less during her regular shifts. Additionally, Ms. Clark testified in her deposition that being assigned to the medic unit was not

---

[5] It is not clear from the record when Ms. Clark transferred from Station 3 to Station 7 during this time, or how long she had been at Station 7 prior to June 1, 2006.

necessarily a more stressful assignment than being assigned to the fire engine because the stress associated with each assignment depended upon the particular circumstances of the situation to which the firefighters were responding. Therefore, Ms. Clark's own testimony establishes that there were no real distinct disparities in the levels of stress associated with being assigned to the medic unit versus the fire engine. Finally, as a Shock Trauma/Firefighter, Ms. Clark's job responsibilities included both working on the fire engine and in the medic unit, and there is no difference in salary or benefits to either assignment. Thus, even if the record did show that Ms. Clark was assigned to the medic unit more than the fire engine, she has failed to establish how that would be an adverse employment action, as there is no decrease in compensation or loss of benefits, responsibilities, or job title associated with being assigned to the medic unit.

In addition to determining that neither of these actions by the City constitute an adverse employment action, the court also finds that neither of Ms. Clark's arguments create a genuine issue of material fact precluding this court from awarding judgment in favor of the City on these two claims. As to Ms. Clark's claim that her transfer was discriminatory because there were individuals within the Fire Department that had never been transferred, she has failed to offer any evidence to support this assertion beyond her own, unsworn statements in her briefs. Ms. Clark has not identified any individuals within the Fire Department who have never been transferred, she has not established that any of these alleged individuals were not members of her protected classes, and she has not established that these alleged individuals would have also fulfilled the Fire Department's personnel needs just as well. Ms. Clark also argued that there were four white, male firefighters at Station 7 that could have also transferred to Station 8 instead of Ms. Clark, and that Ms. Clark's transfer left Station 7 without a Shock Trauma/Firefighter and five

Shock Trauma/Firefighters at Station 8. The City, however, has explained that Ms. Clark was chosen to be transferred because of the disparity in medic calls between Station 7 and Station 8. Station 7 averaged about two medic calls per day, whereas Station 8 averaged six or seven calls per day. Additionally, transferring Ms. Clark to Station 7 resulted in a better ratio of Shock Trauma/ Firefighters per battalion, and provided Battalion 3, which included Station 8 and received more medic calls, with more Shock Trauma/Firefighters than Battalion 2, which included Station 7 and received fewer medic calls. Ms. Clark does not offer any evidence to refute the City's reasoning, she merely disagrees with the City's logic, and that, without more, is insufficient.

The court finds that Ms. Clark has not met her burden of establishing that the City's actions constituted adverse employment actions, and therefore, she cannot sufficiently present a prima facie case of either gender or racial discrimination. However, even if the court were to conclude that Ms. Clark presented a prima facie case of gender and/or racial discrimination, the City has presented legitimate, non-discriminatory reasons for its actions, and Ms. Clark has presented no evidence indicating that these reasons were a pretext for discrimination. The City explained that it transferred Ms. Clark, the only Shock Trauma/Firefighter at Station 7, shift C, to Station 8 because Station 8 received significantly more emergency calls requiring the medic unit than Station 7, and her transfer resulted in a better ratio of Shock Trauma/Firefighters per Battalion. The City also acknowledged that Ms. Clark's transfer would leave Station 7, shift C without a Shock Trauma/Firefighter, but given the relatively low number of emergency calls for the medic unit that Station 7 received, these calls could easily be filled by overtime or "swing" personnel. This explanation is a legitimate, non-discriminatory reason for transferring Ms. Clark

to Station 8, and Ms. Clark has failed to present any evidence from which this court could conclude that this reasoning is a pretext for either gender or racial discrimination. As to her claim regarding the alleged discrepancy in her being assigned to the medic unit more than the fire engine at Station 7, the court noted above that the evidence in the record clearly contradicts the validity claim. The City has established that Ms. Clark was not assigned to the medic unit more than the fire engine while at Station 7. Additionally, the City has explained that supervisors at Station 7 attempted to rotate the medic unit and fire engine assignments for Shock Trauma/Firefighters, but that occasional discrepancies in assignment scheduling occur due to sick leave, personal days, or other personnel issues. Ms. Clark has presented nothing that indicates the City's evidence is either incorrect or inaccurate, or that the City's explanation for any scheduling discrepancies is actually a pretext for discrimination.

Thus, the court finds that Ms. Clark has failed to establish a <u>prima facie</u> case of discrimination, and that even if Ms. Clark met her initial burden, the City has presented sufficient evidence establishing that it had legitimate, nondiscriminatory reasons for its actions that the court finds were not a pretext for discrimination. The court finds that summary judgment in favor of the defendant is appropriate on Counts 1 and 2.

2.  <u>Claim of Retaliation in violation of Title VII (Count 3)</u>

Ms. Clark also raises a claim of retaliation, asserting that the City retaliated against her for filing her first EEOC complaint alleging discrimination by prohibiting her from working overtime during certain periods of her employment and denying her an opportunity to trade time with a coworker.

It is well established that "[b]efore a plaintiff may file suit under Title VII . . . [s]he is

required to file a charge of discrimination with the EEOC." Jones v. Calvert Group, Ltd., 551 F.3d 297, 300 (4th Cir. 2009). Additionally "[t]he scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents," and "'[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" Id. (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996)). However, "a failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim." Id. (citing Davis v. North Carolina Dep't of Corr., 48 F.3d 134, 138-40 (4th Cir. 1995)). 42 U.S.C. § 2000e-5(b) clearly specifies the actions the EEOC must take before a litigant may bring a Title VII claim in federal court, and "[a] federal discrimination claim brought by a private party cannot be heard by a federal district court until the EEOC has conducted an investigation and determined the validity of the claim." Davis, 48 F.3d at 137-38 (citing 4 2U.S.C. § 2000d-5(b)). 42 U.S.C. § 2000e-5(b) "requires that the EEOC decide whether the agency will bring the claim in federal court or whether the complainant will be issued a right-to-sue letter, which letter is essential to initiation of a private Title VII suit in federal court," Id. (citing 4 2U.S.C. § 2000d-5(b)). Thus, a plaintiff may only bring a Title VII claim in federal court after she has filed a charge with the EEOC, the EEOC has investigated the charge, and the EEOC has issued the plaintiff a right-to-sue letter. Additionally, the plaintiff's Title VII claim in federal court is limited to only those claims stated in or related to the initial charge filed with the EEOC.

In this case, Ms. Clark filed two EEOC complaints. The first was filed on July 27, 2006, and only alleged claims of racial and gender discrimination. Ms. Clark received a right-to-sue

letter from the EEOC on the July 27, 2006 complaint on November 1, 2008, and filed suit in this court in January 2009. Thus, Ms. Clark properly exhausted her administrative remedies prior to bringing her Title VII claims of racial and gender discrimination in this court. However, Ms. Clark's retaliation claim was not raised in her first EEOC complaint filed in July 2006, rather Ms. Clark first alleged a claim for retaliation in her second EEOC complaint filed on October 15, 2007. Ms. Clark later amended this EEOC complaint on February 12, 2009. However, the EEOC has not yet issued Ms. Clark a right-to-sue letter as to her October 2007 EEOC complaint. Therefore, as Ms. Clark's retaliation claim is not related to her discrimination claims and she has not yet received a right-to-sue letter on her retaliation claim, she has not yet exhausted her administrative remedies with respect to the retaliation claim. Therefore, this court lacks jurisdiction to consider her retaliation claim, and it must be dismissed.

## Conclusion

For the reasons stated above the court **GRANTS** the City's motion for summary judgment, and **DENIES** Ms. Clark's motion for summary judgment. Ms. Clark has failed to establish a prima facie case for either gender or racial discrimination, and summary judgment in favor of the City is appropriate as to Counts 1 and 2. Ms. Clark has failed to exhaust her administrative remedies with respect to Count 3, as the EEOC has yet to issue her a right-to-sue letter for her EEOC complaint alleging retaliation. Therefore, this court lacks jurisdiction over Count 3, and it must be dismissed. The Clerk is **DIRECTED** to enter judgment in favor of the City of Chesapeake.

The pro se plaintiff is **ADVISED** that she may appeal from this Final Order by forwarding a written notice of appeal to the Clerk of the United States District Court, United

States Courthouse, 600 Granby Street, Norfolk, Virginia, 23510. Said written notice must be received by the Clerk within thirty (30) days of the date of this Order. FED. R. APP. P. 3.1; 28 U.S.C. §§ 636(c)(4), (5).

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to the pro se plaintiff, and all counsel of record.

**IT IS SO ORDERED.**

/s/ *(signature)*
Jerome B. Friedman
United States District Court

Norfolk, VA
August 19, 2009